**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LUIS RAFAEL AGUIAR OLIVARES,

                              Petitioner,

    v.                                                    9:26-cv-00203 (AMN)

ICE CUSTODIAN and BROOME
COUNTY CORRECTIONAL FACILITY,

                              Respondents.

**APPEARANCES:**                                    OF COUNSEL:

**LUIS RAFAEL AGUIAR OLIVARES**
Broome County Correctional Facility
P.O. Box 2047
Binghamton, New York 13902
Petitioner *pro se*

**NINOSKA MERCEDES OLIVARES PRIETO**
900 Milton Avenue – Apartment 1
Syracuse, New York 13204
*Next Friend to Petitioner*

**UNITED STATES ATTORNEY FOR THE**          **DAVID M. KATZ, ESQ.**
**NORTHERN DISTRICT OF NEW YORK**           Assistant United States Attorney
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261
*Counsel for Respondent ICE Custodian*

**BROOME COUNTY ATTORNEY'S OFFICE**          **JOSHUA T. TERRELL, ESQ.**
Broome County Office Building                Assistant Broome County Attorney
P.O. Box 1766
60 Hawley Street
Binghamton, New York 13902
*Counsel for Respondent*
*Broome County Correctional Facility*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

1

## I.      INTRODUCTION

On October 8, 2025, United States Immigrations and Customs Enforcement agents ("ICE") arrested petitioner Luis Rafael Aguiar Olivares ("Petitioner") in Syracuse, New York and detained him at the Broome County Correctional Facility ("State Respondent") in Binghamton, New York. Dkt. No. 7-1 at ¶¶ 8, 10, 12; Dkt. No. 5 at 2.[1]

On February 9, 2026, Ninoska Mercedes Olivares Prieto, Petitioner's mother and next friend, filed an emergency petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, seeking, *inter alia*, Petitioner's immediate release. Dkt. No. 1 ("Petition"); *see also* Dkt. No. 2.

On February 10, 2026, the Court issued an order directing the State Respondent and the federal Respondent (the "Government" and, together, "Respondents") to show cause why the Petition should not be granted. Dkt. No. 3. The Court also set a briefing schedule, scheduled a hearing for February 19, 2026, and prohibited Respondents from moving Petitioner outside the jurisdiction of the Northern District of New York while this matter is pending. *Id.*

On February 19, 2026, following careful consideration of the parties' submissions, Dkt. Nos. 1, 2, 5, 7, 11, and arguments during the hearing, the Court issued an oral ruling from the bench, granting the Petition and ordering Petitioner's immediate release. The Court issued a short written order that same afternoon. Dkt. No. 13. Respondents have submitted status reports stating that Petitioner was released later that same day. Dkt. Nos. 14-15.

The Court previously indicated that it would issue a longer written decision explaining its ruling in due course, *see, e.g.,* Dkt. No. 13 at 2, and now sets forth that explanation.

---

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

## II.    BACKGROUND

The relevant facts in this matter are straightforward.

### A.  Petitioner's Parole into the United States

Petitioner is a native and citizen of Venezuela.  Dkt. No. 1 at 3; Dkt. No. 7-1 at ¶ 4.  On December 3, 2023, Petitioner applied for admission at the Brownsville, Texas port of entry.  Dkt. No. 7-1 at ¶ 4.  Records submitted by the Government state that Petitioner "arrived with a scheduled CBP One appointment."[2]  Dkt. No. 7-2 at 2.  According to Petitioner's mother, he had been waiting in Mexico for months to receive this appointment.

The Government's records also indicate that Petitioner arrived at his scheduled appointment with immigration authorities "without documents sufficient for lawful entry into the United States."  Dkt. No. 7-2 at 2; *see also* Dkt. No. 7-1 at ¶ 4.  As a result, Petitioner received a notice to appear ("Notice") in removal proceedings under Section 240 of the Immigration and Nationality Act ("INA").[3]  Dkt. No. 7-2 at 3.  The Notice charges that Petitioner is subject to

---

[2] "CBP One was a mobile application launched by the Department of Homeland Security (DHS) in October 2020.  It enabled noncitizens to book an appointment to appear for inspection at a port of entry, submit information in advance, and potentially obtain parole or admission into the country. . . .  During the Biden Administration, DHS began directing noncitizens to use the CBP One mobile application as the primary, if not the exclusive, mechanism to seek parole and/or asylum at the southwestern border.  The Trump Administration disabled that functionality in CBP One in January 2025[.]"  *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 57 n.2, 66 (D.D.C. 2025) (citations omitted).

[3] "In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ('IIRAIRA'), Congress established the two main processes for removing noncitizens deemed ineligible to enter or remain in the United States.  The 'usual removal process' is commonly referred to as 'Section 240' and is codified in 8 U.S.C. § 1229a.  Section 240 proceedings involve an evidentiary hearing before an immigration judge, where a noncitizen may 'attempt to show that he or she should not be removed.'  This process was established by Congress to create 'a 'streamlined' removal process . . . '[f]or illegal aliens already present in the U.S.''  In these proceedings, noncitizens have a right to hire counsel, to a reasonable opportunity to examine evidence against them, to present evidence on their own behalf, and to cross-examine any government witnesses.  The proceedings themselves are recorded, typically take place over the course of multiple hearings and months, and upon a decision by the immigration judge, either party may appeal to the Board of Immigration Appeals

removal under Section 212(a)(7)(A)(i)(I) of the INA (codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I)). *Id.* at 2, 6. The Notice ordered Petitioner to appear before an immigration judge in Miami, Florida, on October 5, 2027. *Id.* at 3. Instead of being detained prior to this date, however, a declaration submitted by the Government states that Petitioner was "released from DHS custody on parole" on December 3, 2023.[4] Dkt. No. 7-1 at ¶ 5; *see also* Dkt. No. 7-2 at 2 ("[Petitioner] was processed for an NTA and paroled into the U.S. pending a 240 hearing.").

After being paroled into the United States, Petitioner obtained another appointment with immigration authorities in connection with his application for employment authorization. Dkt. No. 1 at 12-13. The Petition contains an earnings statement indicating federal and state taxes were withheld from Petitioner's subsequent wages. *Id.* at 16. Petitioner's mother contends that Petitioner also attended all his other scheduled appointments with immigration authorities. The

---

('BIA'). The BIA's decision may then be appealed to a United States court of appeals." *Rodriguez-Acurio v. Almodovar*, No. 25-cv-6065, --- F. Supp. 3d ----, 2025 WL 3314420, at *8 (E.D.N.Y. Nov. 28, 2025) (alterations in original) (citations omitted).

[4] The Government argues that parole pursuant to 8 U.S.C. § 1182(d)(5)(A) is discretionary, *see, e.g.,* Dkt. No. 7 at 12-13, and acknowledged during the hearing that Petitioner's release on parole was the result of an individualized determination by an immigration officer. *See also Rodriguez-Acurio*, 2025 WL 3314420, at *11 ("Parole pursuant to Section 1182(d)(5)(A) serves a unique function. Although Section 1182(d)(5)(A) 'does not grant . . . 'admission' to the United States,' it 'allows the executive to permit certain aliens 'on a case-by-case basis' to enter or remain in this country only for 'urgent humanitarian reasons or significant public benefit.'' Accordingly, a Section 1182(d)(5)(A) parolee's 'physical presence within the United States cannot be said to be unlawful or illegal because it is authorized by the Attorney General, and parole has long been understood to constitute lawful status.' As a result, noncitizens 'paroled into the United States' under Section 1182(d)(5)(A): (1) may be eligible to access certain Federal public benefits (if paroled into the United States for a period of at least one year), 8 U.S.C. §§ 1611(a), 1641(b)(4); (2) can apply for adjustment of status under 8 U.S.C. § 1255(a); and (3) can seek employment authorization, 8 C.F.R. § 274a.12(c)(11).") (alteration in original) (first quoting *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011); and then quoting *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019)); *Qasemi v. Francis*, No. 25-cv-10029, 2025 WL 3654098, at *4 (S.D.N.Y. Dec. 17, 2025) ("The accompanying regulations clarify that parole may be granted only where the noncitizen 'presents neither a security risk nor a risk of absconding.'") (quoting 8 C.F.R. § 212.5(b)).

Government has not argued otherwise.  *See generally* Dkt. No. 7.

While on parole, Petitioner prepared an application for asylum, which he submitted on or about December 1, 2024.  Petitioner's asylum application remains pending.  Dkt. No. 1 at 3. According to his mother, the situation in Venezuela was so dire that Petitioner could not return. Documentation submitted by the Government states that Petitioner has "claimed fear."  Dkt. No. 7-2 at 11.

On April 18, 2025, the Government contends, "DHS terminated the Petitioner's parole."[5] Dkt. No. 7-1 at ¶ 6.  Nothing in the record indicates that federal authorities contemporaneously undertook any efforts to detain Petitioner or to inform him of this termination.

### B. Petitioner's Detention

Approximately six months later, on October 5, 2025, the Oneida County Sheriff's Office arrested Petitioner and charged him with driving while intoxicated.[6]  Dkt. No. 7-1 at ¶ 7.  On

---

[5] The Government acknowledged during the hearing that there is no evidence in the record that this termination was the result of an individualized determination as to Petitioner.  *See also Coal.*, 805 F. Supp. 3d at 66 ("The Trump Administration disabled [parole] functionality in CBP One in January 2025 and terminated all grants of parole authorized through that application in April 2025.") (citations omitted); *Bakhtani v. Marich*, No. 25-cv-1500, 2026 WL 322625, at *2 n.5 (W.D.N.Y. Feb. 6, 2026) ("[Petitioner] also was sent an automated email on April 11, 2025, stating that his parole had been terminated as a result of the government's decision to revoke parole 'for hundreds of thousands of individuals who entered via the CBP One application.'") (citation omitted); *Orellana v. Francis*, No. 25-cv-04212, 2025 WL 2402780, at *1-2 (E.D.N.Y. Aug. 19, 2025) ("On December 18, 2024, Petitioner and his partner entered the United States through a port of entry in Brownsville, Texas, after successfully applying to enter the country through a parole program called Customs & Border Protection One, or "CBP One." . . . . Petitioner and his partner were granted permission to lawfully enter the United States on a temporary basis and given humanitarian parole under 8 U.S.C. § 1182(d)(5). . . . Respondents contend that Petitioner's parole was terminated on April 18, 2025[.]") (citations omitted).

[6] Petitioner subsequently pled guilty to driving while ability impaired in violation of New York Vehicle and Traffic Law § 1192.01 ("DWAI").  Dkt. No. 11-1 at 7; *see also United States v. Perez*, No. 24-cr-368, 2025 WL 2047829, at *3 (S.D.N.Y. July 22, 2025) ("'New York law defines a DWAI offense as a violation of civil vehicular law, not of the criminal code.'  'A traffic infraction is not a crime and the punishment imposed therefor shall not be deemed for any purpose a penal or criminal punishment.'  'Federal and New York State courts have frequently recognized this

October 6, 2025, ICE "was notified, via the Alien Criminal Response Management System (A[C]RIMe)" of Petitioner's arrest by local law enforcement authorities.  Dkt. No. 7-2 at 10.  On October 8, 2025, ICE agents arrested Petitioner at a residence in Syracuse and fingerprinted him at an ICE office in Syracuse.  Dkt. No. 7-1 at ¶¶ 8, 10-11.

One of the arresting ICE agents also prepared a "Form I-200 Warrant for Arrest of Alien" ("Form I-200") with Petitioner's name.  The Form I-200 cites as legal authority "sections 236 and 287 of the [INA] and part 287 of title 8, Code of Federal Regulations[,]" Dkt. No. 7-2 at 8, "which correspond to 8 U.S.C. §§ 1226 and 1357 and 8 C.F.R. §§ 287.1-287.12[,]" *Rodriguez-Acurio*, 2025 WL 3314420, at *5 (citation omitted).  The Form I-200 further states "that there is probable cause to believe that [Petitioner] is removable from the United States" based upon "the pendency of ongoing removal proceedings against [Petitioner]" and "biometric confirmation of the [Petitioner]'s identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the [Petitioner] either lacks immigration status or notwithstanding such status is removable under U.S. immigration law[.]" Dkt. No. 7-2 at 8.  Documentation submitted by the Government indicates that Petitioner was served with the Form I-200 at the ICE Syracuse office.  *Id.* at 11.

Later on October 8, 2025, Petitioner was transported to the Broome County Correctional Facility, where he remained detained until the Court ordered his release on February 19, 2026.  *Id.*; Dkt. No. 5 at 2; Dkt. No. 13.  Petitioner requested, but never received, a bond hearing during his monthslong detention.  *See, e.g.,* Dkt. No. 1 at 3.

---

distinction.'") (citations omitted).  The Government does not argue that Petitioner's state arrest or disposition provided a basis for his detention by federal authorities.  *See generally* Dkt. No. 7.

### C. Petition for Writ of Habeas Corpus

The Petition asserts that Petitioner's detention violates his due process rights under the Fifth Amendment. *Id.* at 3.

## III.    LEGAL STANDARD

Pursuant to 28 U.S.C. § 2241, a district court is authorized "to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).  It is well-settled that "[n]oncitizens are also entitled to challenge through habeas corpus the legality of their ongoing detention." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (citing *Boumediene v. Bush*, 553 U.S. 723, 771 (2008)).  "The 'necessary scope' of this review and resulting relief 'in part depends upon the [procedural] rigor of any earlier proceedings.'" *Id.* (alteration in original) (quoting *Boumediene*, 553 U.S. at 781).  And "[t]he Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Id.* (first quoting *Boumediene*, 553 U.S. at 781-83, 786; and then citing *I.N.S. v. St. Cyr*, 533 U.S. 289, 301-02 (2001)).

Finally, district courts must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *Walker v. Senecal*, 130 F.4th 291, 297 (2d Cir. 2025) (quoting *Kravitz v. Purcell*, 87 F.4th 111, 119 (2d Cir. 2023)).

## IV.    Discussion

### A. Habeas Requirements

Petitioner's mother filed the Petition on behalf of her son.  *See, e.g.,* Dkt. No. 1 at 3.  An "[a]pplication for a writ of habeas corpus shall be in writing signed and verified by the person for

7

whose relief it is intended *or by someone acting in his behalf*." 28 U.S.C. § 2242 (emphasis added). "A person acting on behalf of the person for whom the habeas petition is filed is known as a 'next friend.'" *Iza by Iza v. Larocco*, No. 25-cv-6915, --- F. Supp. 3d ----, 2026 WL 31378, at *8 (E.D.N.Y. Jan. 5, 2026) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990)) (finding habeas petitioner's mother had next friend standing). The Court finds that Petitioner's mother has satisfied the requirements for next friend standing, in part based on her conduct in this matter and the nature of Petitioner's arrest and detention. *Doe v. Hochul*, 139 F.4th 165, 177 (2d Cir. 2025) ("As the Supreme Court has explained, there are 'at least two firmly rooted prerequisites for 'next friend' standing.' 'First, a 'next friend' must provide an adequate explanation – such as inaccessibility, mental incompetence, or other disability – why the real party in interest cannot appear on his own behalf to prosecute the action.' 'Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate.'") (quoting *Whitmore*, 495 U.S. at 163). Similarly, numerous "courts in the Southern and Eastern Districts of New York have decided habeas petitions in recent months brought by a next friend with a significant relationship to a detainee in this matter." *Ndoye v. Joyce*, No. 25-cv-8856, 2026 WL 306387, at *1 n.2 (S.D.N.Y. Feb. 5, 2026) (collecting cases); *see also Walker*, 130 F.4th at 297.[7] Accordingly, the Court considers the Petition filed by Petitioner's mother on behalf of Petitioner, "who remains the real party in interest." *Whitmore*, 495 U.S. at 163 (citations omitted).

The Court further finds that the Petition is properly before it. "Generally, '[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States,' he must file the petition in the district of confinement and name his immediate custodian as the

---

[7] The Government did not object to Petitioner's mother participating in the hearing on behalf of her son, nor did the Government argue during the hearing that she lacked standing to proceed as her son's next friend. *But see* Dkt. No. 7 at 1 n.1.

respondent." *Ozturk v. Hyde*, 136 F.4th 382, 390 (2d Cir. 2025) (alteration in original) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004)).  The Petition was filed in the district of Petitioner's detention and names Respondents as Petitioner's immediate custodians.  Dkt. No. 1.  Respondents have both appeared through counsel.  Dkt. Nos. 4, 6.  Neither contends that Petitioner has improperly named his immediate custodian.  *See, e.g., Valdes Acevedo v. Nassau Cnty. Corr. Ctr.*, No. 26-cv-250, 2026 WL 184645, at *12 (E.D.N.Y. Jan. 24, 2026) ("Respondents have waived any objection based on the Petition's failure to name a specific custodian or supervisory government official.") (first citing *Skaftouros v. United States*, 667 F.3d 144, 146 n.1 (2d Cir. 2011); and then citing *Gooden v. Gonzales*, 162 F. App'x 28, 29 (2d Cir. 2005)).

### B.  Statutory Basis for Detention

Through the INA, Congress has created a comprehensive statutory framework that provides for the detention of certain noncitizens during immigration proceedings:

> For noncitizens who do not have an order of removal, detention is governed by 8 U.S.C. § 1225(b), § 1226(a), or § 1226(c).  Generally, § 1225(b) applies to "arriving" noncitizens or "applicants for admission" who are "seeking admission."  Section 1226(c) governs the detention of noncitizens apprehended within the United States on criminal grounds.  Section 1226(a) is a catchall provision that governs the detention of any other noncitizen apprehended by immigration enforcement and is generally understood to apply to noncitizens "already present in the United States," i.e., no longer at the border.

*Rashid v. Trump*, 807 F. Supp. 3d 349, 356-57 (D. Vt. 2025) (citations omitted).

The central legal issue in this matter is which provision of the INA applies to noncitizens like Petitioner who reside within the United States, and this same legal issue has already been addressed by hundreds of federal courts in recent months.  *See, e.g., Castañon-Nava v. Dep't of Homeland Sec.*, 161 F.4th 1048, 1060 (7th Cir. 2025) ("The question is whether § 1225(b)(2)(A) covers any noncitizen who is unlawfully already in the United States as well as those who present themselves at its borders."); *Cardenas v. Almodovar*, No. 25-cv-9169, 2025 WL 3215573, at *1

9

(S.D.N.Y. Nov. 18, 2025) ("[The question is] whether, as a person who has long been living in the United States after entering the country unlawfully, [petitioner] is detained under 8 U.S.C. § 1225(b)(2)(A) or []he is detained under 8 U.S.C. § 1226(a).  The distinction has great significance because detention under Section 1225(b)(2)(A) is, with rare exceptions not relevant here, mandatory.  By contrast, '[d]etention pending adjudication of removal under Section 1226 is discretionary and affords noncitizens detained thereunder the right to an initial determination as to eligibility for release and the opportunity for a bond hearing upon detention.'") (fourth alteration in original) (quoting *Tumba v. Francis*, No. 25-cv-8110, --- F. Supp. 3d ----, 2025 WL 3079014, at *2 (S.D.N.Y. Nov. 4, 2025)).

Until recently, this issue was not subject to serious dispute.  *See, e.g., Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) ("In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2) [i.e., Section 235 of the INA].  It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c) [i.e., Section 236 of the INA].");  *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 508 (5th Cir. 2026) ("The Congress that passed IIRIRA would be surprised to learn it had also required the detention without bond of two million people.  For almost thirty years there was no sign anyone thought it had done so, and nothing in the congressional record or the history of the statute's enforcement suggests that it did.  Nonetheless, the government today asserts the authority and mandate to detain millions of noncitizens in the interior, some of them present here for decades, on the same terms as if they were apprehended at the border.") (Douglas, J., dissenting) (footnote omitted); *Barco Mercado v. Francis*, No. 25-cv-6582, --- F. Supp. 3d ----, 2025 WL 3295903, at *2 (S.D.N.Y. Nov. 26, 2025) ("One month before [petitioner] was seized, the current administration in Washington unilaterally

decided to try to change the rules governing the freedom of noncitizens like [petitioner]. . . . [T]he current administration's change of heart . . . exceeded its authority and, in any case, was wrong. . . . The only thing that had changed was that the current administration told ICE agents in substance that it did not agree with the law that had been applied consistently for decades, and that ICE agents should arrest noncitizens, even those who had been released pending removal proceedings, who have lived here for lengthy periods, and who have complied with the conditions of their release.") (footnotes omitted).

In opposition to the Petition, the Government now presents its new legal position to this Court, as it has to hundreds of other federal courts in recent months. Dkt. No. 7 at 14 ("[Petitioner] remains subject to mandatory custody under 8 U.S.C. § 1225(b)(2)(A)."). The vast majority of federal courts have rejected the Government's new position, including all of the courts within this District that have addressed it to date. *See, e.g., Labrada-Hechavarria v. U.S. Att'y Gen.*, Nos. 23-13664, 24-10645, 2026 WL 496486, at *2 (11th Cir. Feb. 23, 2026) (summary order) (*per curiam*) ("[T]he majority of district courts to have addressed this issue have rejected the government's new position—that all noncitizens who came into the United States illegally but are living in the United States must now be detained under § 1225[] until their removal proceedings are completed.") (citation omitted) (remanding to BIA for further proceedings); *Barco Mercado*, 2025 WL 3295903, at *4 ("This is not the first time the administration's change of heart has been challenged in court. By a recent count, the central issue in this case – the administration's new position that *all* noncitizens who came into the United States illegally, but since have been living in the United States, *must be detained* until their removal proceedings are completed – has been challenged in at least 362 cases in federal district courts. The challengers have prevailed, either on a preliminary or final basis, in 350 of those cases decided by over 160 different judges sitting in about fifty

different courts spread across the United States.  Thus, the overwhelming, lopsided majority have held that the law still means what it always has meant.") (footnotes omitted); *Noguez v. Brophy et al.*, Case No. 26-cv-00030, Dkt. No. 14 at 6 (N.D.N.Y. Feb. 13, 2026)) ("The other Northern District Judges who have been asked to evaluate the Department of Homeland Security's blanket policy to detain everyone who has ever crossed the border, regardless of any of the case's other details, have also reached the same conclusion. . . . that 28 U.S.C. § 1226(a), not § 1225(b)(2)(A), governs Petitioner's detention.") (citations omitted) (D'Agostino, J.) ("*Noguez*"); *Gaspar v. Akshar et al.*, Case No. 26-cv-00118, Dkt. No. 13 at 12 (N.D.N.Y. Feb. 17, 2026) ("[T]he Court agrees with [the] majority view and concludes that § 1226(a) governs Petitioner's detention, not— as Respondents argue—§ 1225(b)(2)(A)[.]") (Sannes, C.J.) ("*Gaspar*"); *Alvarez v. Philips et al.*, Case No. 26-cv-00058, Dkt. No. 11 at 6 (N.D.N.Y. Feb. 17, 2026) ("[T]he Court disagrees and again adheres to its conclusion that [ ] § 1226(a), not § 1225(b)(2)(A), governs Petitioner's detention.") (Brindisi, J.) (citation and footnote omitted) ("*Alvarez*"); *Perez v. Akshar et al.*, Case No. 26-cv-00120, Dkt. No. 19 at 5 (N.D.N.Y. Mar. 5, 2026) ("This Court agrees with the majority position and concludes that [petitioner], who was paroled into the United States more than two years before his October 2025 arrest, was not seeking admission when he was arrested and that, for the persuasive reasons articulated by other district courts, Section 1226(a), not Section 1225(b)(2)(A) applies.") (citations omitted) (Coombe, J.) ("*Perez*").

Based on the record before it and the arguments presented by the parties, the undersigned joins those many federal courts who have rejected the Government's new position.  The Court concludes that Petitioner is detained under Section 1226(a), not under Section 1225(b)(2)(A).  As the court in *Perez* observed, "[t]his conclusion is compelled by the text of Section 1225 itself, by the context and overall statutory scheme, and by the amendment history of Section 1226, including

the Laken Riley Act amendment enacted just months ago." *Perez*, Dkt. No. 19 at 5 (quotations, alterations, and citations omitted).  The Court also finds persuasive the statutory analyses of Sections 1225(b)(2)(A) and 1226(a) set forth in *Gaspar*, Dkt. No. 13 at 12-15, *Noguez*, Dkt. No. 14 at 6 (discussing, *inter alia*, *Martins v. Akshar et al.*, Case No. 26-cv-00095, Dkt. No. 16 at 6-8 (N.D.N.Y. Feb. 3, 2026) ("*Martins*")), *Alvarez*, Dkt. No. 11 at 5-6 (discussing, *inter alia*, *Martins*), and the dissenting opinion in *Buenrostro-Mendez*, 166 F.4th at 508-21, as well as the authorities discussed in each of these opinions.

Additional facts in this particular case further confirm that Petitioner's detention is subject to Section 1226(a).  Section 1226(a) "applies when a noncitizen is 'arrested and detained' '[o]n a warrant issued by the Attorney General.'"  *Minarcaja Concha v. Lyons*, No. 25-cv-6695, --- F. Supp. 3d ----, 2026 WL 215417, at *14 (E.D.N.Y. Jan. 28, 2026) (alteration in original) (quoting 8 U.S.C. § 1226(a)).  "That is precisely what occurred here."  *Id.*  The Government contends that Petitioner was arrested on October 8, 2025 pursuant to a Form I-200.  *See, e.g.,* Dkt. No. 7-1 at ¶ 9.  The Government also acknowledged during the hearing that the face of this document states that it was issued "pursuant to section[] 235" of the INA, which is codified at 8 U.S.C. § 1226.  Dkt. No. 7-2 at 8; *Rodriguez-Acurio*, 2025 WL 3314420, at *5.  As other courts have recognized, "[a]lthough not dispositive standing alone," an arrest in connection with a Form I-200 "supports the conclusion that [petitioner's] 2025 detention is governed by Section 1226(a)'s discretionary framework."  *Minarcaja Concha*, 2026 WL 215417, at *14 (citations omitted).  In contrast, the Government submits no contemporaneous documentation to support its position that Petitioner's arrest and detention were pursuant to Section 1225(b)(2)(A).  *See, e.g.,* Dkt. No. 7 at 16 ("8 U.S.C. § 1226(a) does not displace 8 U.S.C. § 1225(b)(2)(A). . . . The specific, mandatory language of § 1225(b)(2)(A)  governs  over  the  general,  permissive  language  of  § 1226(a).")  (citations

omitted);[8] *see also Singh v. Maldonado*, No. 26-cv-00019, 2026 WL 233216, at \*5 (E.D.N.Y. Jan. 29, 2026) ("Petitioner's arrest record is devoid of any reference to § 1225, and Respondents have not presented any records showing that Petitioner was detained pursuant to § 1225.") (citations omitted).

In sum, the Court finds meritless the Government's position that Petitioner—who, more than two years ago, made an appointment with immigration authorities, presented himself at a port of entry, was paroled into the country, and whose asylum application remains pending—is subject to mandatory detention as if he had been arrested attempting to unlawfully cross the border. *See, e.g., Buenrostro-Mendez*, 166 F.4th 508-09 ("[T]he government today asserts the authority and mandate to detain millions of noncitizens in the interior, some of them present here for decades, on the same terms as if they were apprehended at the border. . . . The overwhelming majority of courts in this circuit and elsewhere have recognized that the government's position is totally unsupported.") (Douglas, J., dissenting) (footnote omitted); *Han v. Noem*, No. 25-cv-10753, 2026 WL 322963, at \*4 n.2 (S.D.N.Y. Feb. 6, 2026) ("Since ICE's policy change approximately seven months ago, hundreds of courts have struck down the Government's attempts to mandatorily detain immigrations who are already present in the United States. . . . Respondents' attempts to continue detaining individuals under the same problematic statutory interpretation despite hundreds of

---

[8] Relatedly, the Court finds unpersuasive the Government's suggestions at oral argument that the Form I-200 was superfluous, because Petitioner's detention is mandatory under Section 1225(b)(2)(A), or that Petitioner could be simultaneously detained under both Section 1226(a) and Section 1225(b)(2)(A). *See, e.g., Lira Caceres v. Shanahan*, No. 26-cv-00016, 2026 WL 233215, at \*4 (E.D.N.Y. Jan. 28, 2026) ("The relevant statutory provisions, § 1225 and § 1226, are mutually exclusive, meaning a noncitizen may be subject only to one, not both.") (collecting cases); *Romero v. Hyde*, 795 F. Supp. 3d 271, 286 (D. Mass. 2025) ("It is therefore simply incorrect to say that section 1225 is more 'specific' than  section 1226.  Rather, they are 'mutually exclusive,' as the Government has acknowledged in at least one other case.") (citing *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484-86 (S.D.N.Y. 2025)).

14

judges holding otherwise is an unequivocal rejection of statutory and constitutional mandates.'").

As a result, under the circumstances of this case, "Petitioner may only be subject to detention as a matter of discretion under § 1226(a)." *Singh*, 2026 WL 233216, at *8.

### C. Requisite Due Process

"No one disputes that the Fifth Amendment entitles noncitizens to due process of law." *Velasco Lopez*, 978 F.3d at 850 (citations omitted). "Accordingly, the Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* (citation omitted). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at that heart of the liberty that Clause protects." *Zadvyas v. Davis*, 533 U.S. 678, 690 (2001) (citation omitted).

Given that Petitioner's detention is pursuant to Section 1226(a), he is entitled to certain process. *See, e.g., Singh*, 2026 WL 233216, at *9 ("[T]o the extent DHS seeks to detain a noncitizen pursuant to the discretionary authority provided by 1226(a), ICE must follow certain procedural safeguards."); *O.F.B. v. Maldonado*, No. 25-cv-6336, --- F. Supp. 3d ----, 2025 WL 3277677, at *3 (E.D.N.Y. Nov. 25, 2025) ("Section 1226, however, provides that detention is discretionary and, if detained, a noncitizen may then request a bond hearing before an immigration judge[.]") (citation omitted); *Cardenas*, 2025 WL 3215573, at *1. The Government admitted at the hearing that Petitioner had requested, but had not received, a bond hearing. In factually similar cases, other courts have concluded that a petitioner's detention without a bond hearing amounts to a due process violation. *See, e.g., Perez*, Dkt. No. 19 at 5-7; *Crespo Tacuri v. Genalo*, No. 25-cv-06896, 2026 WL 35569, at *7 (E.D.N.Y. Jan. 6, 2026) (collecting cases); *see also Qasemi*, 2025 WL 3654098, at *13 ("[D]iscretionary detention under the ambit of Section 1226(a) requires the exercise of discretion. Where there is no evidence or argument that such discretion was exercised,

15

detention under that subsection is illegal.").

This Court reaches the same conclusion. In this case, the relevant factors weigh uniformly in favor of finding that Petitioner's Fifth Amendment rights were violated.[9] *Velasco Lopez*, 978 F.3d at 851 ("The three *Mathews* factors are: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see also Gaspar*, Dkt. No. 13 at 16-18; *Noguez*, Dkt. No. 14 at 7-9.

First, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Id.* (citation omitted). Second, given the absence of process in connection with Petitioner's detention, the risk of an erroneous deprivation of that Petitioner's liberty interest is high. *See, e.g.*, *Perez*, Dkt. No. 19 at 6-7 ("[Petitioner] did not have an opportunity to post bond or argue for release on conditions. In addition, there is nothing in the record indicating that (1) there were changed circumstances between when he was paroled into the United States and when he was arrested that support the

---

[9] Additionally, *see supra* n.5, there is no evidence in the record that Petitioner's parole was terminated pursuant to an individualized assessment. *See Bakhtani*, 2026 WL 322625, at *3 ("Because there is no evidence that [petitioner]'s parole was properly terminated, and because his abrupt and continuing detention without notice or a meaningful opportunity to be heard violates his right to due process, there is no lawful basis for [petitioner]'s continued detention."); *Munoz Materano v. Arteta*, 804 F. Supp. 3d 395, 419 (S.D.N.Y. 2025) ("[Petitioner]'s re-detention without any individualized assessment such as 'any change in circumstances' since the government released him on parole 'establishes a high risk of erroneous deprivation of his protected liberty interest.'" (first quoting *Benitez*, 795 F. Supp. 3d at 495; and then citing *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 153 (W.D.N.Y. 2025)); *see generally Francois v. Hale*, No. 26-cv-13, 2026 WL 472845 (D. Vt. Feb. 19, 2026).

change in [petitioner]'s detention status, (2) [petitioner] is a risk of flight or a danger to the community, or (3) anyone considered whether, given his specific situation, [petitioner] was a risk of flight or a danger to the community. As a result, there is a high risk of erroneous deprivation of Petitioner's liberty.") (citations omitted). Third, because the Government identities only a generalized interest in "ensuring the appearance of aliens at future immigration proceedings[,]" Dkt. No. 7 at 25, but does not argue that Petitioner is a flight risk, the Government's interest appears minimal in this particular case. *See, e.g., Alvarez*, Dkt. No. 11 at 8 ("Finally, 'the government's interest in continued detention is slight insofar as [P]etitioner was detained without an individualized custody determination that evaluated the dangerousness and flight risk or any articulated change in circumstances.'") (quoting *Crespo Tacuri*, 2026 WL 35569, at *7).

### D. Appropriate Remedy

"Habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release." *Munaf v. Green*, 553 U.S. 674, 693 (2008) (citations omitted); *see also Boumediene*, 553 U.S. at 779 ("[T]he habeas court must have the power to order the conditional release of an individual unlawfully detained—though release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted.") (citations omitted).

The Court finds that immediate release is the appropriate remedy here for each of the Fifth Amendment violations identified above. *See, e.g., Gaspar*, Dkt. No. 13 at 18 (collecting cases); *Rodrigeuz-Acurio*, 2025 WL 3314420, at *31, 32 ("[Petitioner]'s detention was unlawful from its inception because ICE detained her under the wrong statute and without affording her any notice or process whatsoever, much less the procedures due under Section 1226(a). . . . ICE caused [petitioner] to be placed in custody in violation of her rights to procedural due process. The proper

remedy for that unlawful detention is release."); *Francois*, 2026 WL 472845, at *10 ("District courts have ordered immediate release from custody in other cases that addressed petitioners based upon the unlawful revocation of parole.") (citation omitted); *see also Tumba v. Francis*, No. 25-cv-8110, --- F. Supp. 3d ----, 2025 WL 3079014, at *8-9 (S.D.N.Y. Nov. 4, 2025) (finding that *Mathews* factors did not apply, but that release remained the appropriate remedy).

### E. The Government's Presentation of its Position

Having addressed the merits of the Petition, the Court is compelled to remark on the presentation of the Government's position in this case. As has been observed elsewhere:

> Reading Respondents' memorandum of law in opposition to the Petition,[10] one would be forgiven for thinking that application of Section 1225(b)(2)(A) to a petitioner in [petitioner]'s position was an uncontroversial, if not settled proposition. Respondents do not cite even one case going the other way, let alone acknowledge that their position has been rejected by the overwhelming majority of district judges to consider the issue[.]

*Cardenas*, 2025 WL 3215573, at *3.

Here, the Government's submission similarly fails to cite any of the hundreds of decisions from federal courts across the country rejecting the arguments advanced by the Government. *See generally* Dkt. No. 7. The Government instead asserts, in a footnote, that:

> Because this case involves an "arriving alien," it is *distinguishable from many cases* that arise out of the Board of Immigration Appeals' decision in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), which dealt more generally with the authority to detain aliens who are unlawfully present within the United States because they are physically present but have not been lawfully admitted after inspection and therefore are classified generally as applicants for admission. With that said, the Federal Respondent *notes there is a split of authority in that context as to whether § 1225 or § 1226 governs*, with the majority of district court opinions finding § 1226 governs in that context, but [t]he only circuit court to address the issue has ruled in favor of the Government's position. *Buenrostro-Mendez v. Bondi*, No. 25-20496, 2026 WL 323330 (5th Cir. Feb. 6, 2026). *For the same reason, the Federal Respondent respectfully submits the recent orders issued by Judge*

---

[10] The Court's observations herein in no way apply to the State Respondent, who did not submit a memorandum of law in opposition to the Petition. *See* Dkt. No. 5.

> *D'Agostino, Chief Judge Sannes, and Judge Coombe do not have precedential value here*.

Dkt. No. 7 at 16 n.3 (emphasis added).

This presentation of the Government's position is problematic for several reasons. First, contrary to the Government's characterization, cases arising out of *Yajure Hurtado* are directly relevant to this case. *See, e.g., Rashid*, 807 F. Supp. 3d at 357 ("[*Yajure Hurtado*] has upended the historical delineation between detention under § 1225(b) and § 1226(a); the former was understood to be for noncitizens apprehended at or near the border, while the latter was understood to be for noncitizens apprehended within the interior of the United States, no matter their manner of entry. The validity of *Yajure Hurtado*'s reasoning is being litigated in federal courts across the country.") (collecting cases).

Second, the Government offers no analysis to support its claim that this case is distinguishable from "many"—but not all—of the "cases that arise out of" *Yajure Hurtado*. Dkt. No. 7 at 16 n.3. To be sure, not all habeas petitions filed in recent months present the same facts, raise analogous legal arguments, or seek identical relief. But, as detailed above, the central legal issue here is the very same one that has inundated the federal judiciary. *See, e.g., supra* Section IV.B. To simply wave away the weight of such authority is misleading. Indeed, the Government subsequently acknowledges the applicability of this authority by asserting that "[t]he only circuit court to address the issue has ruled in favor of the Government's position." Dkt. No. 7 at 16 n.3 (citing *Buenrostro-Mendez*, 166 F.4th 494).

Third, the Government's assertion concerning circuit-level precedent is wrong: "the federal appellate courts are divided as to the applicability of §§ 1225[] and 1226(a)." *Labrada-Hechavarria*, 2026 WL 496486, at *2 (citations omitted). Indeed, both the majority and dissenting opinions in the Fifth Circuit decision cited by the Government address the Seventh Circuit's

contrary decision. *See, e.g., Buenrostro-Mendez*, 166 F.4th at 502 n.8 (majority opinion); *id.* at 508 n.1 (dissenting opinion); *see also Castañon-Nava*, 161 F.4th at 1060-61 ("Plaintiffs highlight a host of cases where courts have held that ICE's authority to detain a noncitizen discovered within the country derives from § 1226(a) and not from § 1225(b). . . . Based upon the text and structure of the two provisions, we believe that Plaintiffs have the better argument on the current record.") (citations omitted).

Fourth, the Court finds troubling the Government's suggestion that "[f]or the same reason," "the recent orders issued by Judge D'Agostino, Chief Judge Sannes, and Judge Coombe do not have precedential value here." Dkt. No. 7 at 16 n.3. Relegating these adverse rulings to a passing reference in a footnote, again without citation or analysis, is a dismissive treatment of the judicial resources expended in recent weeks in this District, on an emergent basis, to review, research, consider, and rule on the very legal issue presented here.[11] Such rulings, while not binding, are nonetheless important persuasive authority that the Government should address. *See, e.g., Cardenas*, 2025 WL 3215573, at *3 ("Granted, none of those decisions was 'controlling' here, but the Court expects better from litigants before this Court — and all the more so from the United States Attorney's Office, which 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, . . . is not that it shall win a case, but that justice shall be

---

[11] To be sure, not all of the final decision and orders from these judges had issued before the Government made its submission on February 13, 2026. Dkt. No. 7. But, prior to that time, all three judges had held hearings and issued both oral rulings and written orders, or a final decision and order. *See, e.g., Gaspar*, Dkt. No. 10 (Feb. 5, 2026 written order, following oral ruling during hearing that same day); *Perez*, Dkt. No. 16 (Feb. 6, 2025 written order, following oral ruling during hearing that same day); *Martins*, Dkt. No. 16 (Feb. 3, 2026 decision and order). And three more final decision and orders were issued prior to the hearing in this matter, including one from a fourth judge. *Noguez*, Dkt. No. 14 (Feb. 13, 2026 decision and order); *Gaspar*, Dkt. No. 13 (Feb. 17, 2026 decision and order); *Alvarez*, Dkt. No. 11 (Feb. 17, 2026 decision and order).

done.'") (alteration in original) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that the Petition for a writ of habeas corpus, Dkt. No. 1, is **GRANTED**; and the Court further

**ORDERS** that having considered the particular circumstances of this case and *Mathews v. Eldridge*, 424 U.S. 319 (1976), Petitioner Luis Rafael Aguiar Olivares shall not be re-detained without adequate notice to Petitioner and his mother and next friend, Ninoska Mercedes Olivares Prieto, and without an opportunity to be heard at a hearing where the Government will have the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a) and the burden to demonstrate by clear and convincing evidence that Petitioner is either a danger to the community or a flight risk; and the Court further

**ORDERS** that pending the issuance of any final removal order against Petitioner Luis Rafael Aguiar Olivares, Respondents are also enjoined from denying him bond in any subsequent proceeding on the basis that he must be detained pursuant to 8 U.S.C. § 1225(b), absent a change in relevant circumstances, consistent with this Memorandum-Decision and Order.

**ORDERS** that the Clerk of the Court enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Dated: March 11, 2026
Albany, New York

_____
Anne M. Nardacci
U.S. District Judge

21